Deanna R. Rader (SBN 020448)
Jamie L. Mayrose (SBN 024190)
RADER MAYROSE, LLP
812 North Second Avenue
Phoenix, Arizona 85003
Telephone: (602) 384-2292
drader@radermayrose.com
jmayrose@radermayrose.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hygenes Garcia and Rebecca Lynne Zaner, husband and wife; Kevin Tucker, a single man; and Kristen Island and Kevin Island, husband and wife;<br><br>Plaintiffs,<br><br>vs.<br><br>Wallace MacDonald Holdings, LLC, a Wyoming limited liability company; WallaceMac Holdings, Inc., a Wyoming Corporation; Nuvex Group, Inc., a Nevada Corporation aka Nuvexion; Quantum X USA, Inc., a Wyoming Corporation, aka Quantum X Holdings; Stone Correa aka Raymond Restrepo Correa aka Raymond Restrepo aka Raymond Joseph Parsons aka Raymond Parsons aka Joseph Parsons aka Davis Parsons and Eliana Marcela Restrepo, husband and wife,<br><br>Defendants. | Case No.:<br><br>Verified Complaint |

Plaintiffs Hygenes Garcia ("Garcia"), Rebecca Lynne Zaner, Kevin Tucker ("Tucker"), Kristen Island ("Island") and Kevin Island (all of whom are referred to

collectively as "Plaintiffs") hereby allege the following in support of their Complaint against Defendants Wallace MacDonald Holdings, LLC, WallaceMac Holdings, Inc., Nuvex Group, Inc. aka Nuvexion, Quantum X USA, Inc., aka Quantum X Holdings; Stone Correa aka Raymond Restrepo Correa aka Raymond Restrepo aka Raymond Joseph Parsons aka Raymond Parsons aka Joseph Parsons aka Davis Parsons and Eliana Marcela Restrepo, (collectively, "Defendants").

**NATURE OF THE ACTION**

1. Garcia and Kristen Island assert claims against Defendants Wallace MacDonald Holdings, LLC, WallaceMac Holdings, Inc., and Stone Correa (collectively, "WallaceMac Defendants") under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, et seq., Arizona Wage Act, A.R.S. §§ 23-363, et seq. ("AWA"), and the Arizona Minimum Wage Act, A.R.S. §§ 23-362, et seq. ("AMWA") for failure to pay wages owed as required by these statutes and for retaliation after they complained about the WallaceMac Defendants violations of the FLSA, AWA, and AMWA.

2. Tucker asserts claims against the WallaceMac Defendants under the FLSA and New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1, et seq ("NJWPL") for failure to pay wages owed as required by these statutes.

3. Garcia, Tucker, and Kristen Island also assert claims against the WallaceMac Defendants for breach of their respective employment agreements.

4. Garcia also asserts claims against the WallaceMac Defendants and Eliana Restrepo for breach of oral agreement, breach of the implied covenant of good faith and fair dealing, and unjust enrichment arising from a corporate credit card account with American Express that Garcia opened for the WallaceMac Defendants based upon their promise to be responsible for and pay all expenses charged on such account.

5. Plaintiffs further assert claims against the WallaceMac Defendants, Nuvex Group, Inc., and Quantum X USA, Inc., for fraud and violations of Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934, Wyoming Uniform Securities Act

("WUSA"), Wy. Stat. §§ 17-4-101, et seq, Arizona Securities Act ("ASA"), A.R.S. §§ 44-1801, et seq., and New Jersey Uniform Security Law ("NJUSL"), N.J.S.A. §§ 49:3-47, et seq.

**JURISDICTION, AND VENUE**

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 29 U.S.C. §§ 201, et seq., and 15 U.S.C. §§ 78am et seq., because this civil action arises under the Constitution and law of the United States.

7. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because the state law claims asserted herein are so related to claims in this action over which this Court has subject matter jurisdiction that they form part of the same case or controversy under Article II of the United State Constitution.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because acts giving rise to Plaintiffs' claims occurred within the District of Arizona, and Defendants regularly conduct business in and have engaged in the wrongful conduct alleged herein – and, thus, are subject to personal jurisdiction in – this judicial district.

**PARTIES**

9. Plaintiff Hygenes Garcia was at all times relevant to this matter a resident of Maricopa County, Arizona.

10. Plaintiff Rebecca Lynne Zaner was at all times relevant to this matter a resident of Maricopa County, Arizona.

11. Plaintiffs Hygenes Garcia and Rebecca Lynne Zaner are husband and wife.

12. Plaintiff Kevin Tucker was at all times relevant to this matter a resident of Passaic County, New Jersey.

13. Plaintiffs Kristen Island and Kevin Island (collectively, the "Island Plaintiffs") are husband and wife and were at all times relevant to this matter residents of Maricopa County, Arizona.

14. Defendant Wallace MacDonald Holdings, LLC, ("WM Holdings") is a Wyoming limited liability company, conducting business in, inter alia, Maricopa County, Arizona.

15. Upon information and belief, Defendant WM Holdings is the parent company of Defendant WallaceMac Holdings, Inc.

16. Defendant WallaceMac Holdings, Inc., ("WallaceMac") is a Wyoming corporation, conducting business in, inter alia, Maricopa County, Arizona.

17. Under the FLSA and state wage laws, Defendant WallaceMac is an employer and was an employer of Plaintiffs Garcia, Tucker, and Kristen Island.

18. Defendant WM Holdings exerted significant control over WallaceMac's employees' work conditions and operated as an integrated enterprise, making WM Holdings and Wallace Mac joint employers of Plaintiffs Garcia, Tucker, and Kristen Island.

19. Defendant Quantum X USA, Inc. ("Quantum X") is a Wyoming corporation, conducting business in, inter alia, Maricopa County, Arizona.

20. Upon information and belief, Quantum X Holdings is a trade name of Quantum X USA, Inc., and both are collectively referred to as "Quantum X" throughout this Complaint.

21. Nuvex Group, Inc., ("Nuvex") is a Nevada corporation, conducting business in, inter alia, Maricopa County, Arizona.

22. Upon information and belief, Nuvexion is either a trade name or a division of Nuvex that may have been organized or incorporated by Defendants. Nuvex and Nuvexion are collectively referred to as "Nuvex" throughout this Complaint.

23. Upon information and belief, WallaceMac is the parent company of Nuvex, as well as other businesses.

24. At all relevant times, the WallaceMac Defendants and Nuvex conducted business, had offices, and/or maintained agents for the transaction of its customary business in Maricopa County, Arizona.

25. Defendant Stone Correa aka Raymond Restrepo Correa aka Raymond Restrepo aka Raymond Joseph Parsons aka Raymond Parsons aka Joseph Parsons aka Davis Parsons ("Stone Correa" or "Correa") is a resident of Idaho and possibly Florida, and he is the majority stockholder of Wallace Mac, the owner, member/manager of WM Holdings, and the majority stockholder of Nuvex Group, Inc.

26. Defendant Correa was at all relevant times an owner of Defendants WM Holdings, Wallace Mac, and Nuvex.

27. Defendant Correa was at all relevant times an employer of Garcia, Tucker and Kristen Island, as he acted directly in the interest of the WallaceMac Defendants in relation to Plaintiffs.

28. At all relevant times Defendant Stone Correa possessed and exercised direct and/or indirect managerial, economic, and operational control over Garcia, Tucker, Island, and other employees of Defendants WM Holdings and Wallace Mac, including but not limited to, exercising authority to hire and fire employees, determining job duties and work hours, and rates of pay, and is subject to individual liability under the FLSA.

29. Defendant Eliana Marcela Restrepo ("Restrepo") is the wife of Stone Correa. Restrepo and Correa are referred to, collectively, as the "Correa Defendants."

30. The Correa Defendants were at all relevant times residing in Twin Falls County, Idaho.

31. The marital community of the Correa Defendants is liable for the acts and omissions of the Correa Defendants because they were each, at all times relevant to the acts and omissions alleged in this Complaint acting on behalf of, and for the benefit of, their marital community.

**FACTUAL BACKGROUND**

**Stone Correa**

32. Upon information and belief, Stone Correa's legal name is Raymond Joseph Parsons.

33. In preliminary investigations, Plaintiffs discovered that Correa has used several names in the past, including, without limitation, Raymond Restrepo Correa, Raymond Restrepo, Raymond Joseph Parsons, Raymond Parsons, Joseph Parsons, Davis Parsons, David Parsons, and Clayton Griffins.

34. Upon information and belief, Correa has multiple prior convictions under various names and alias, including passing bad checks, defrauding an innkeeper, credit card fraud, wire fraud, grand theft, fraud, and impersonating a contractor.

35. Plaintiffs also discovered that Correa has started several companies throughout the years in various states and using several alias, including, without limitation, Fargo Electrical, Inc., Magnatix, Inc., REV Energy Group, Fargo Renewables Inc., Fargo EVS, Inc., Fargo Renewables Engineering Group, Inc., Wallace MacDonald Holdings, LLC, WallaceMac Holdings, Inc., Quantum X USA, Inc., Magnatix, Inc., Dragon Mining, Inc., and Nuvex Group, Inc.

36. Upon information and belief, Correa has been sued several times for various claims involving contract indebtedness and breach of contract.

37. Upon information and belief, Correa was subject to an administrative action before the South Carolina Securities Commissioner for violations of the South Carolina Uniform Securities Act, related to the sale of unregistered securities to an investor.

38. Correa has represented himself to Plaintiffs and others as a retired Marine and an electrical engineer with a Master of Science in Electrical Engineering with various profession certifications and/or credentials.

39. Upon information and belief, Correa does not possess an engineering degree and he is not a credentialed or certified engineer.

40. Upon information and belief, Correa is a scam artist who has spent the majority of his life defrauding individuals, which he has done by using a variety of aliases, business names, and schemes, many of which involve obtaining investments for new and exciting technology that he has purportedly developed and for which he has federal contracts.

41. Upon information and belief, Correa has a pattern and practice of incorporating various entities, fraudulently soliciting investments through the sale of securities, hiring employees to develop intellectual property, and then taking the money invested for his personal use without paying employees' wages and benefits and corporate debts, and without ever actually following through on his promises to investors. When the business ultimately fails, usually within a year or two, he creates another one.

42. Upon information and belief, Correa is currently under investigation by the Federal Bureau of Investigation and other law enforcement and regulatory agencies related to his fraudulent conduct.

**Garcia's Employment**

43. Plaintiff Hygenes Garcia was previously employed by Exyte, US Inc. ("Exyte"), as a Lead Project Manager.

44. While employed at Exyte, Garcia worked directly with Correa on a programming design project called Quantum X USA, a Photovoltaic Technology Campus to be located near Mountain Home, Idaho.

45. In July 2024, the Quantum X USA programming design project was completed by Exyte.

46. Around August 2024, Defendant Correa recruited Garcia to support his vision of a fully integrated Photovoltaic Technology campus and his plans to start WallaceMac to further his work.

47. In or around September 2024, Defendant Correa incorporated WallaceMac and organized WM Holdings.

48. Garcia shared Correa's interest in Photovoltaic technology and Correa continued to recruit Garcia to help him organize WM Holdings and establish WallaceMac and WM Holdings as leaders in Photovoltaic technology.

49. Correa convinced Garcia and his wife, Rebecca Lynne Zaner, to financially invest in WallaceMac and Quantum X and , and Garcia and Zaner purchased stock in WallaceMac and Quantum X.

50. Correa also persuaded Garcia to work for WallaceMac through the offer of an employment agreement ("Garcia Agreement") prepared by the WallaceMac Defendants, which Garcia accepted on October 4, 2024.

51. At the time Garcia accepted Wallace Mac's offer, Garcia was not aware that Correa was an alias or that Correa had a criminal history under various names.

52. After 27 years of loyal service with Exyte, Garcia began his official employment with WallaceMac as its Director of Engineering on November 4, 2024.

53. Garcia was not given an opportunity to negotiate any of the provisions of the Agreement and had already been working for Wallace Mac, albeit informally, for approximately one month.

54. The Agreement provided for a five-year term of employment and allowed the Agreement to be terminated for cause, as defined in the Agreement, and without cause.

55. The Agreement entitled Garcia to payment of all accrued unpaid base salary, accrued vacation, and severance pay in the event of termination without cause.

56. The Agreement further entitles Garcia to compensation after notice of termination has been given by either party throughout the notice period and Garcia was obligated to continue providing services to WallaceMac during the notice period.

57. The Agreement set forth Garcia's duties and responsibilities as Director of Engineering.

58. Garcia was tasked with, inter alia, the hiring, training, and professional development of Wallace Mac's Engineering team and budget and resource management for the Engineering Department.

59. From his employment start date to his termination, Garcia led and completed the following tasks at the direction of Defendant Correa for the benefit of WallaceMac as a new Start-up company:

a. Opened Amex Small Business Platinum credit card.

b. Set-up company business phones with Verizon and AT&T.

c. Set-up Workers Compensation.

d. Set-up Health Benefit plans (Medical, Dental, Vision, AD&D, LTD, STD, etc.).

e. Recruited and hired Corporate Water Engineer – John Morgan.

f. Recruited and hired Director of Procurement and Compliance – Kristen Island.

g. Recruited and hired Director of Civil and Structural Engineering – Roderick Grier.

h. Recruited and hired Director of Information Technology – Theresa Grier.

i. Recruited and hired Director of Mechanical Engineering – Kevin Tucker.

60. During Garcia's employment, he faithfully and competently performed all assigned duties of the Director of Engineering.

61. In exchange for Garcia's services as the Director of Engineering, WallaceMac was contractually obligated to pay Garcia an annual base salary of $250,000, to be paid in bi-weekly installments consistent with Wallace Mac's payroll practices.

62. In or around December 2024, Correa directed Garcia to open a corporate credit card account for Wallace Mac.

63. On behalf of WallaceMac, Garcia opened a Platinum Small Business credit card with American Express ("Amex Card") and requested Amex Cards for himself, Correa (under the name Raymond Restrepo), and two other employees.

64. Because Garcia opened the Amex Card account, he was listed as the primary account holder.

65. Over time, additional Amex Cards were requested for other employees of the WallaceMac Defendants with Correa's full knowledge and/or at his direction.

66. Garcia used the Amex Card for business travel and other business expenses, such as wireless service, employee background checks, and purchasing computers and phones for the Engineering Department.

67. In March 2025, Garcia had requested that Correa be substituted as the primary Amex Card holder and responsible party for the account.

68. Correa responded by accusing Garcia of distrust and selfishness.

69. Ultimately, Correa agreed that he or another family member would become the primary Amex Card holder responsible party for the Amex Card Account.

70. In April 2025, Correa was involved in negotiations to purchase property located in Nevada with the intent to build a fully integrated Photovoltaic Technology Campus there.

71. On or about early May 2025, Correa directed Garcia to use the Amex Card to place a deposit or "earnest money" with the seller of the Nevada property and Garcia made the deposits as directed.

72. Correa subsequently advised Plaintiffs and WallaceMac's employees that the purported seller of the Nevada property did not own the property and that WallaceMac's deposit was taken as part of a fraudulent scheme.

73. Upon hearing of the alleged commercial real estate fraud, Garcia reported the fraudulent transaction to Amex and attempted to reverse the charges made for the deposit, but Amex would not do so.

74. WallaceMac lost approximately $260,000 as a result of the alleged fraud and, according to Correa, the fraud dispute caused the Amex Card to be suspended on July 29, 2025.

75. According to Correa, in or around July 2025, US Bank froze all Wallace Mac's bank accounts due to questionable charges the banker deemed suspicious activity.

76. Since July 18, 2025, WallaceMac has not paid any of its employees' wages for the work performed.

77. When the Amex Card account was suspended, Garcia was made aware that he was still the primary card holder, which made him personally liable for the amounts the WallaceMac Defendants had charged on the account.

78. Garcia again voiced his frustration to Correa personally about being the primary card holder and strongly expressed the need to be removed as such, but as of the date of this filing, Correa has not done so and Garcia remains the responsible party for the Amex Card account.

79. In mid-August, according to Correa, US Bank closed all his accounts.

80. Correa also claimed he was unable to access Wallace Mac's bank accounts to pay other business expenses, including the balance on the Amex Platinum Small Business credit card.

81. Correa convinced Garcia and the other employees that he would pay their back wages as soon as he could access Wallace Mac's new bank accounts.

82. Garcia and other WallaceMac employees continued working for Correa for the next six weeks without any payment of wages and on Correa's promise to pay all outstanding wages due and owing once Correa was able to access Wallace Mac's accounts.

83. As the Director of Engineering, Garcia received several complaints from the employees he managed regarding Wallace Mac's failure to pay wages owed to them.

84. Garcia also became concerned about Wallace Mac's continued failure to pay wages and began asking Correa for some action or plan as to when and how Garcia and his employee team would be paid.

85. When Garcia brought up the unpaid wages, Correa became enraged and accused Garcia of not caring about him (i.e., Correa) or checking to see how Correa was doing due to the commercial property fraud.

86. Over time, Garcia's relationship with Correa became strained.

87. Garcia noticed that Correa and executive assistant, Karen Reese, continued using the Amex Card in June and July 2024 for personal expenses.

88. For example, Correa informed Garcia and various others that he was getting a new spa for his home in Idaho, and Garcia discovered that Correa had used his Amex Card at Snake River Pool & Spa for a purchase of approximately $24,000.

89. Both Correa and Reese repeatedly used the Amex Card to purchase non-business related items from Lowe's and the Home Depot to build a deck for Correa's new hot tub spa, totaling over $65,000.

90. Garcia became alarmed at the continuing charges as he had learned that Amex considered him to be the responsible party for ensuring the Amex Card account was paid since he was the primary cardholder who opened the account.

91. Correa agreed that he or another family member would become the responsible party on the Amex Corporate Account, but as of the date of this filing, Correa has not done so and Garcia remains the responsible party for the Amex Corporate account.

92. In August 2025, Amex suspended the business platinum corporate account and on September 4th, 2025, Amex cancelled the account entirely due to ongoing fraud dispute and unusual high spending..

93. The cancellation of the Amex Card stopped the process of transferring primary ownership to Correa, which left Garcia with the responsibility of paying the outstanding balance.

94. On September 6, 2025, when Garcia again brought up the issue of the unpaid wages, Correa accused Garcia of selfishness, stating that the focus should be on the commercial real estate fraud and how much money Correa has lost and threatening to lay off all the staff

95. On September 8, 2025, Garcia reached out to Correa, who refused to speak with Garcia about work or other related matters.

96. Upon information and belief, Correa directed David Noot, Wallace Mac's acting President/Operations Director, to be the contact person for Garcia moving forward.

97. On or about September 10, 2025, Correa reportedly called Plaintiff Kevin Tucker, a licensed Mechanical Engineer and direct report to Garcia. Correa discussed a payroll update with Tucker and then proceeded to criticize Garcia's behavior towards Correa, stating he was going to terminate Garcia's employment.

98. According to Tucker, Correa, Noot, Tucker and Kumbali Satori were all present on the phone call, and Correa stated that Tucker could disclose the group's conversation to Garcia.

99. Neither Correa, Noot, nor any other executive employee contacted Garcia to inform him that his employment would be terminated.

100. Garcia continued working and providing services for WallaceMac up to September 11, 2025, when he discovered that he could no longer access his WallaceMac email account, work phone, and other WallaceMac servers/drives Garcia used to perform his duties.

101. On September 15, 2025, Garcia used his personal email account to reach out to Noot as well as Wallace Mac's Human Resources consultant, Shannan Bradley, to inquire and provide an update about his employment status; however, Noot and Bradley did not respond to his email attempt.

102. As of the date of this filing, neither Correa, Noot, nor Bradley has communicated directly with Garcia about his employment or any termination of his employment.

103. Although Garcia's access was eliminated on September 11, 2025, he had not received any notice of termination, either for cause or without cause.

104. Correa has never formally terminated Garcia or provided the cause for termination, and Defendants have made no effort to pay Garcia the wages due or refund his investment.

105. Noot stopped speaking with and responding to Garcia, even though Garcia was directed that Noot was the appropriate contact person.

106. On October 3, 2025 Garcia called Noot, who immediately ended the call once Garcia identified himself as the caller.

107. As of the date of this filing, Garcia has not received any notice of termination of the Agreement or of his employment.

108. As of the date of this filing, Garcia has not received any payment of wages or other compensation for the time worked from July 13, 2025 through September 11, 2025.

109. As of September 15, 2025, the Amex Card account had an outstanding balance of $80,872.82 and Garcia has been forced to enroll in a debt consolidation program to repay the balance owed over 60 months, with interest.

110. Garcia has repeatedly asked Defendants to pay the outstanding balance or to take action to be listed as the responsible party for the outstanding balance, but they have failed and/or refused to do so.

**Tucker's Employment**

111. On behalf of the WallaceMac Defendants, Garcia recruited Kevin Tucker to serve as the Director of Mechanical Engineering.

112. On March 12, 2025, WallaceMac offered Tucker an employment agreement, which Tucker accepted on March 15, 2025 ("Tucker Agreement").

113. At the time Tucker accepted WallaceMac's offer, Tucker was not aware that Correa was an alias or that Correa had a criminal history.

114. Pursuant to the Tucker Agreement, Tucker's location of employment was at Wallace Mac's office in Miami with an approved home location in Wayne, New Jersey.

115. Tucker was not given an opportunity to negotiate any of the provisions of the Agreement.

116. The Agreement indicated that Tucker would be a full-time, regular exempt employee, receiving an annual salary of $210,000, paid biweekly every other Friday.

117. The Agreement set forth Tucker's duties and responsibilities as Director of Mechanical Engineering.

118. Tucker began his employment with WallaceMac on April 1, 2025.

119. During his employment, Tucker faithfully and competently performed all assigned duties of the Director of Mechanical Engineering.

120. Tucker did not receive his first paycheck from WallaceMac but received subsequent paychecks until July 2025.

121. Tucker received his last paycheck from WallaceMac on July 18, 2025.

122. Although Tucker continued working after July 18, 2025, he was not paid for such work.

123. Tucker continued working for WallaceMac until October 2025, as the WallaceMac Defendants kept promising to pay employees.

124. Tucker finally resigned his employment effective October 10, 2025.

125. At the time of his resignation, WallaceMac owed Tucker $35,080.24 in unpaid wages.

126. As of the date of this filing, Tucker has not been paid the wages due and owing to him for services provided to the WallaceMac Defendants.

**Kristen Island's Employment**

127. Garcia also recruited and hired Kristen Island as WallaceMac's Director of Procurement and Compliance.

128. On December 31, 2024, WallaceMac offered Island an employment agreement, which she accepted that same date ("Island Agreement").

129. At the time Island accepted Wallace Mac's offer, Island was not aware that Correa was an alias or that Correa had a criminal history.

130. Pursuant to the Island Agreement, Island's location of employment was at Wallace Mac's office in Idaho with an approved home location in Avondale, Arizona.

131. The Island Agreement indicated that Island would be a full-time, regular exempt employee, receiving an annual salary of $155,000, paid biweekly every other Friday.

132. Island was on probationary status during the first 90 days of her employment, during which time she could have been terminated without cause.

133. The Island Agreement set forth Island's duties and responsibilities as Director of Procurement and Compliance.

134. Island began her employment with WallaceMac on January 20, 2025.

135. During her employment, Island faithfully and competently performed all assigned duties of the Director of Procurement and Compliance.

136. Defendants refused to pay Island for the first forty hours she worked for Wallace Mac despite her repeated demands for such payment.

137. Island successfully completed her probationary period on or about April 20, 2025, and should not have been terminated without cause thereafter.

138. In June and early July 2025, Island began questioning Correa regarding various issues that she learned of through her employment, including his failure to timely pay employee wages, failure to pay invoices, etc., and Correa would respond in a rude and condescending manner, repeatedly telling Island to "stay in her lane."

139. On July 9, 2025, Island received notice of termination of her employment, but no reason for her termination was provided.

140. WallaceMac never provided Island with her first paycheck and her final paycheck was less than the amount WallaceMac owed.

**Investments in Defendant Correa's Companies**

141. In late 2024, Correa offered Garcia the opportunity to purchase stock in Quantum X.

142. Garcia had several conversations with Correa regarding the Quantum X USA design project, Correa's plans for the corporation, Quantum X's relationship with Wallace Mac, and Quantum X's finances.

143. Correa, on behalf of himself and Quantum X, knowingly and intentionally made several false and/or misleading statements, both written and oral, to Garcia regarding Correa, the value of Quantum X, the funding Correa had available to develop and operate Quantum X, the value of its stock, and its technology to induce Garcia to invest his money in Quantum X.

144. These false and/or misleading statements were designed to induce and did induce Garcia and Zaner to jointly purchase Quantum X stock.

145. Garcia and Zaner reasonably relied on the statements made by Correa and Quantum X, which induced them to jointly purchase common stock in Quantum X pursuant to a stock purchase agreement.

146. Garcia and Zaner did not know and had no reason to know that Quantum X was operated as a fraud, that Correa was an alias, or that Correa had previous convictions under other names at the time they purchased the Quantum X stock.

147. Garcia and Zaner did not know and had no reason to know that the information provided by Correa was false at the time they purchased the Quantum X stock.

148. Garcia and Zaner would not have purchased the Quantum X stock had they known the information provided by Correa and Quantum X was false, that Correa had previous criminal convictions, or that Quantum X was operated as a fraud.

149. Correa and Quantum X defrauded Garcia and Zaner into purchasing worthless stock in a worthless company, and the Defendants used the money invested to fund their lifestyle.

150. In late 2024 and throughout 2025, the WallaceMac Defendants offered executive employees the opportunity to purchase stock in Wallace Mac.

151. The WallaceMac Defendants offered shares of common stock to executives at a reduced price and offered matching shares from Correa at no additional cost to the executives.

152. The WallaceMac Defendants knowingly and intentionally made several false and/or misleading statements, both written and oral, to Plaintiffs to induce them to invest their money in WallaceMac through the purchase of stock., including, without limitation, the following:

a. Correa was a licensed professional engineer, had a Master of Science in Electrical Engineering, and possessed other credentials recognized in the engineering industry;

b. Wallace Mac had an audited net present value of $6.9 billion, and later claiming it had an audited net present value of $7.3 billion;

c. The market value of Wallace Mac's stock was $26.80 and projected to increase in value by 15% in the next 12 months;

d. The present value of equity purchased was almost ten times the amount paid for the Wallace Mac stock;

e. The immediate return on investments would equal 943.20% with the one-year return on investment equaling 1,099.60%; and

f. Wallace Mac had federal contracts for its products.

153. These false and/or misleading statements were designed to induce and did induce Plaintiffs to purchase WallaceMac stock.

154. Plaintiffs reasonably relied on the statements made by the WallaceMac Defendants, which induced them each to purchase common stock in WallaceMac pursuant to stock purchase agreements that included the matching shares provision.

155. Plaintiffs did not know and had no reason to know that the WallaceMac Defendants were operated as a fraud, that Correa was an alias, or that Correa had previous convictions under other names at the time they purchased the WallaceMac stock.

156. Plaintiffs did not know and had no reason to know that the information provided by Correa was false at the time they purchased the WallaceMac stock.

157. Plaintiffs would not have purchased the WallaceMac stock had they known the information provided by WallaceMac was false, that Correa had previous criminal convictions, or that the WallaceMac Defendants were operated as a fraud.

158. The WallaceMac Defendants defrauded Plaintiffs into purchasing worthless stock in a worthless company, and the Defendants used the money invested to fund their lifestyle, including making home improvements and traveling.

159. On April 30, 2025, the WallaceMac Defendants offered Tucker the opportunity to invest in Nuvexion, "a flagship entity under Wallace MacDonald Holdings, poised to dominate the global energy storage market."

160. The WallaceMac Defendants offered Tucker a 14% equity interest in Nuvexion for a substantial financial investment.

161. The WallaceMac Defendants knowingly and intentionally made several false and/or misleading statements, both written and oral, to Tucker regarding Stone Correa, owner and founder of Wallace Mac, the value of Wallace Mac, the funding Correa had available to develop and operate WallaceMac and Nuvexion, the value of its stock, its federal contracts, and its technology to induce Tucker to invest his money in WallaceMac and Nuvexion through purchase of an equity interest.

162. These false and/or misleading statements were designed to induce and did induce Tucker to purchase an equity interest.

163. Tucker reasonably relied on the statements made by the WallaceMac Defendants, which induced him to purchase the equity interest.

164. Tucker did not know and had no reason to know that the WallaceMac Defendants were operated as a fraud, that Correa was an alias, or that Correa had previous convictions under other names when he purchased the equity interest.

165. Tucker did not know and had no reason to know that the information provided by Correa was false at the time he purchased the equity interest

166. Tucker would not have purchased the equity interest had he known the information provided by the WallaceMac Defendants was false, that Correa had previous criminal convictions, or that the WallaceMac Defendants were operated as a fraud.

167. The WallaceMac Defendants defrauded Plaintiffs into purchasing a worthless equity interest in a worthless company, and Defendants used the money invested to fund their lifestyle.

168. On June 2, 2025, Correa incorporated Nuvex and listed Tucker as Secretary and Treasurer.

169. Upon information and belief, Nuvexion has been transferred from the WallaceMac Defendants to Nuvex.

170. On or about June 9, 2025, Quantum X was administratively dissolved by the Wyoming Secretary of State for delinquent taxes and is considered inactive.

171. On or about October 9, 2025, Wallace MacDonald Holdings, LLC, was administratively dissolved by the Wyoming Secretary of State for delinquent taxes and is considered inactive.

172. On or about November 9, 2025, WallaceMac Holdings Inc. was administratively dissolved by the Wyoming Secretary of State for delinquent taxes and is considered inactive.

173. As of the date of this filing, Wallace Mac's domain name (Wallace Mac.com) now leads to Nuvex, the new company Correa incorporated in June 2025.

174. Upon information and belief, Correa has started Nuvex as his next fraudulent company to defraud investors.

**COUNT I**

**Wage Payment Violations**

**(Plaintiffs Garcia, Tucker, and K. Island Against the WallaceMac Defendants)**

175. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth herein.

176. Pursuant to the FLSA (29 U.S.C. §§ 206(a) and 207(a)), the NJWPL (N.J.S.A. §§ 34:11-4.1, et seq) and the AMWA (A.R.S. §§ 23-351 and 23-364), Garcia, Tucker, and Island were entitled to timely payments of at least minimum wages under the FLSA, Arizona law, and New Jersey law for all hours of work.

177. The WallaceMac Defendants violated Garcia, Tucker, and Island's right to minimum wages and right to timely wage payments under the FLSA, Arizona law, and New Jersey law by failing to pay Plaintiffs for all hours of work when due and owing.

178. The WallaceMac Defendants' actions were knowing, willful, and in reckless disregard of Plaintiffs' rights under the FLSA, NJWPL, and AMWA.

179. As a result of the WallaceMac Defendants' violations of the FLSA, NJWPL, and AMWA, Plaintiffs are entitled to liquidated damages.

180. Pursuant to A.R.S. § 23-355, Garcia and Island are entitled to recover an amount that is treble the amount of the unpaid wages.

181. Pursuant to N.J.S.A. § 34:11-4.10(c), Tucker is entitled to recover an amount that is treble the amount of the unpaid wages.

**COUNT II**

**Breach of Contract**

**(Plaintiffs Garcia, Tucker, and K. Island Against Wallace Mac)**

182. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth herein.

183. Garcia, Tucker, and Kristen Island entered into valid and enforceable employment agreements that required WallaceMac to timely pay each of them an annual base salary.

184. Although Garcia, Tucker, and Kristen Island fulfilled their contractual obligations and performed work for Wallace Mac, WallaceMac failed and/or refused to pay their base salary for all hours worked.

185. Garcia's employment agreement provided for a five-year term of employment that could only be terminated by written notice of termination for cause or written notice of termination without cause.

186. On September 12, 2025, WallaceMac shut off Garcia's access to all WallaceMac systems necessary to allow Garcia to perform his contractual duties, constructively discharging him from employment.

187. WallaceMac failed to provide Garcia with a notice of termination, with or without cause, and has never notified Garcia that his Employment Agreement has been terminated.

188. Kristen Island's employment agreement prevented WallaceMac from terminating her employment without cause once she completed the 90-day probationary period.

189. Although Kristen Island had completed her probationary period in April 2025, WallaceMac terminated her employment without cause on July 9, 2025.

190. Wallace Mac's actions have breached the express terms of the employment agreements with Garcia, Tucker, and Kristen Island.

191. Wallace Mac's breaches of Garcia's employment agreement has damaged Garcia, depriving him of wages earned and notice of termination in an amount to be proved at trial.

192. Wallace Mac's breaches of Tucker's employment agreement has damaged Tucker, depriving him of wages earned in an amount to be proved at trial.

193. Wallace Mac's breaches of Kristen Island's employment agreement has damaged Island, depriving her of wages earned and continued employment in an amount to be proved at trial.

**COUNT III**

**Breach of Covenant of Good Faith and Fair Dealing**

**(Plaintiffs Garcia, Tucker, and K. Island Against Wallace Mac)**

194. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth herein.

195. Garcia, Tucker, and Kristen Island entered into valid and enforceable employment agreements with Wallace Mac, defining their respective rights and obligations to one another.

196. Implied in every contract, including Plaintiffs' employment agreements, is the duty of good faith and fair dealing.

197. Defendant WallaceMac has breached the duty of good faith and fair dealing by, inter alia, failing to pay Garcia's wages, failing and refusing to communicate with Garcia, and failing to pay charges incurred by WallaceMac on the Amex Card account that Correa directed Garcia, as an employee, to open and put in his name.

198. Defendant WallaceMac has breached the duty of good faith and fair dealing by, inter alia, failing to pay Tucker's wages.

199. Defendant WallaceMac has breached the duty of good faith and fair dealing by, inter alia, failing to pay Kristen Island's wages and terminating her employment without cause.

200. As a result of Wallace Mac's breaches, Garcia, Tucker, and Kristen Island have been deprived of benefits arising from their employment agreements and have been damaged, in an amount to be proven at trial.

**COUNT IV**

**Retaliation**

**(Plaintiffs Garcia and Island Against Correa Defendants and Wallace Mac)**

201. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth herein.

202. By constructively terminating Garcia's and Island's employment after they complained about Defendants' practices related to work hours and wages, Defendants retaliated against Garcia and Island in violation of their rights under state and federal law, including A.R.S. §23-364, § 23-1501(A)(3)(c)(ii) and 29 U.S.C. § 215(a)(3).

203. As a direct and proximate result of Defendants' acts and omissions, Garcia and Island have suffered damages, including but not limited to, lost wages, past and future medical expenses, and a penalty of $150 per day from the date retaliation through judgment.

204. In addition, Garcia and Island have suffered physical impairment, emotional distress, sleeplessness, depression, anxiety, loss of focus and concentration, pain and suffering, inconvenience, mental anguish, embarrassment, frustration, humiliation, and the loss of enjoyment of life.

205. Because Defendants' actions were knowing, willful, and in reckless disregard of his rights under the AMWA and FLSA, Garcia and Island are entitled to punitive damages.

**COUNT V**

**Breach of Oral Contract**

**(Plaintiff Garcia Against the Correa Defendants and Wallace Mac)**

206. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth herein.

207. Correa, on behalf of himself and Wallace Mac, directed Garcia to open an Amex Card account.

208. Correa, on behalf of himself and Wallace Mac, promised to pay all bills and balances due and owing on Wallace Mac's Amex Card account in exchange for Garcia opening the account.

209. The oral agreement between Correa, Wallace Mac, and Garcia with respect to the Amex Card account is a valid and enforceable contract.

210. The Correa Defendants, on behalf of themselves and Wallace Mac, used the Amex Card for personal and business expenses.

211. The Correa Defendants and WallaceMac breached the parties' oral agreement by failing and refusing to pay the bills and outstanding balance due and owing on the Amex Card account.

212. Plaintiff has been damaged as a result of such breach in an amount to be proven at trial.

**COUNT VI**

**Breach of Covenant of Good Faith and Fair Dealing**

**(Plaintiff Garcia Against The Correa Defendants and Wallace Mac)**

213. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth herein.

214. Garcia and WallaceMac entered into a valid and enforceable oral contract with respect to the Amex Card account.

215. Implied in every contract, including the oral contract between the parties, is the duty of good faith and fair dealing.

216. The Correa Defendants and WallaceMac have breached the duty of good faith and fair dealing by, inter alia, charging amounts for personal expenses on the Amex Card account, continuing to charge significant amounts on the Amex Card account after WallaceMac learned it did not have access to funds to pay for such charges, failing and/or refusing to pay any amounts due and owing on the Amex Card account (including charges

related to Correa's home spa), and failing and refusing to communicate with Garcia or substitute the name of another responsible party on the Amex Card account.

217. As a result of such breach, Garcia has been deprived of benefits arising from the oral contract and has been damaged, in an amount to be proven at trial.

**COUNT VII**

**Fraud**

**(Plaintiff Garcia Against the WallaceMac Defendants and Correa Defendants)**

218. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth fully herein.

219. Correa directed Garcia to open the Amex Card account, asserting that it was necessary to assist the start-up of WallaceMac and WM Holdings, and agreeing that he and/or WallaceMac would pay for the charges on the Amex Card account.

220. Correa also agreed to remove Garcia as the responsible party on the Amex Card account and name another responsible party so that Garcia would not have any personal liability for any charges on the Amex Card account.

221. Correa's statements affirming that he and/or WallaceMac would pay for the charges on the Amex Card account, that Garcia would be removed as the responsible party and another person would serve as the responsible party, and that Garcia would not have any personal liability for any charges on the Amex Card account were false statements.

222. Correa's statements were material to Garcia's agreement to open the Amex Card account, obtain Amex Cards on the account for various WallaceMac employees at Correa's direction, and continue to leave the account open through July 2025.

223. Garcia would not have opened the Amex Card account, obtained additional Amex Cards, or left the account open if not for his reliance on these statements.

224. Correa knew that his statements were false when he made them and he intended for Garcia to act in reliance on them with respect to the Amex Card to provide Correa access to funds and/or credit that he could not obtain on his own.

225. Correa has engaged in various fraudulent activities in the past and is skilled in convincing others to give him funds and/or access to credit that he could not obtain or repay.

226. Garcia was unaware that Correa's statements were false when Correa made them and did not know that Correa had a history of engaging in fraud and other deceptive acts under various names.

227. Garcia relied on Correa's statements as true when he opened the Amex Card account for WallaceMac and had a right to rely on the word of Correa, his employer and owner of WallaceMac, who he had previously worked with through Exyte and who had demonstrated that he had funds to pay significant sums for various startup expenses of Wallace Mac.

228. Correa and WallaceMac paid the balances due on the Amex Card account for several months.

229. The Correa Defendants and WallaceMac continued to use the Amex Card account for various business and personal expenses through July 2025, including approximately $65,000 in expenses related to the Correa Defendants' personal spa and deck, until the account was frozen due to the commercial real estate fraud investigation.

230. Neither the Correa Defendants nor WallaceMac have made any payments on the Amex Card account for the past several months and they have taken no action to substitute another party for Garcia as the responsible party for the account.

231. As a result, Garcia has been damaged in an amount to be proven at trial.

**COUNT VIII**

**Fraud**

**(All Plaintiffs Against the WallaceMac Defendants and Correa Defendants)**

232. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth fully herein.

233. In late 2024 and throughout 2025, the WallaceMac Defendants offered executive employees, including Plaintiffs, the opportunity to purchase stock in Wallace Mac.

234. The WallaceMac Defendants offered shares of common stock to executives at a reduced price and offered matching shares from Correa at no additional cost to the executives.

235. The WallaceMac Defendants knowing and intentionally made several false and/or misleading statements, both written and oral, to Plaintiffs regarding Stone Correa, owner and founder of Wallace Mac, the value of Wallace Mac, the funding Correa had available to develop and operate Wallace Mac, the value of its stock, its federal contracts, and its technology to induce executives to invest their money in WallaceMac through the purchase of stock.

236. These false and/or misleading statements were designed by the WallaceMac Defendants to induce and did induce Plaintiffs to purchase WallaceMac stock.

237. Plaintiffs reasonably relied on the statements made by the WallaceMac Defendants, which induced them each to purchase common stock in WallaceMac pursuant to stock purchase agreements that included the matching shares provision.

238. Plaintiffs did not know and had no reason to know that the WallaceMac Defendants were operated as a fraud, that Correa was an alias, or that Correa had previous convictions under other names at the time they purchased the WallaceMac stock.

239. Plaintiffs did not know and had no reason to know that the information provided by Correa was false at the time they purchased the WallaceMac stock.

240. Plaintiffs would not have purchased the WallaceMac stock had they known the information provided by WallaceMac was false, that Correa had previous criminal convictions, or that the WallaceMac Defendants were operated as a fraud.

241. The WallaceMac Defendants defrauded Plaintiffs into purchasing worthless stock in a worthless company, and the Correa Defendants used the money invested to fund their lifestyle, including making home improvements and traveling.

242. As a result, Plaintiffs have been damaged in an amount to be proved at trial.

243. Plaintiffs are entitled to void their stock purchases and obtain a full refund of all amounts invested in the WallaceMac Defendants.

**COUNT IX**

**Fraud**

**(Plaintiffs Garcia and Zaner Against All Defendants)**

244. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth fully herein.

245. In late 2024, Correa offered Garcia the opportunity to purchase stock in Quantum X.

246. Garcia had several conversations with Correa regarding the Quantum X USA design project, Correa's plans for the corporation, Quantum X's relationship with Wallace Mac, and Quantum X's finances.

247. Correa, on behalf of himself and Quantum X, knowingly and intentionally made several false and/or misleading statements, both written and oral, to Garcia regarding Correa, the value of Quantum X, the funding Correa had available to develop and operate Quantum X, the value of its stock, and its technology to induce Garcia to invest his money in Quantum X.

248. These false and/or misleading statements were designed to induce and did induce Garcia and Zaner to jointly purchase Quantum X stock.

249. Garcia and Zaner reasonably relied on the statements made by Correa and Quantum X, which induced them to jointly purchase common stock in Quantum X pursuant to a stock purchase agreement.

250. Garcia and Zaner did not know and had no reason to know that Quantum X was operated as a fraud, that Correa was an alias, or that Correa had previous convictions under other names at the time they purchased the Quantum X stock.

251. Garcia and Zaner did not know and had no reason to know that the information provided by Correa was false at the time they purchased the Quantum X stock.

252. Garcia and Zaner would not have purchased the Quantum X stock had they known the information provided by Correa and Quantum X was false, that Correa had previous criminal convictions, or that Quantum X was operated as a fraud.

253. Correa and Quantum X defrauded Garcia and Zaner into purchasing worthless stock in a worthless company, and the Defendants used the money invested to fund their lifestyle.

254. As a result, Garcia and Zaner have been damaged in an amount to be proved at trial.

255. Garcia and Zaner are entitled to void their purchase of the common stock and obtain a full refund of all amounts invested in Quantum X.

**COUNT X**

**Fraud**

**(Plaintiff Tucker Against All Defendants)**

256. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth fully herein.

257. On April 30, 2025, the WallaceMac Defendants offered Tucker the opportunity to invest in Nuvexion, "a flagship entity under Wallace MacDonald Holdings, poised to dominate the global energy storage market."

258. The WallaceMac Defendants offered Tucker a 14% equity interest in Nuvexion for a substantial financial investment.

259. The WallaceMac Defendants knowing and intentionally made several false and/or misleading statements, both written and oral, to Tucker regarding Stone Correa,

owner and founder of Wallace Mac, the value of Wallace Mac, the funding Correa had available to develop and operate WallaceMac and Nuvexion, the value of its stock, its federal contracts, and its technology to induce Tucker to invest his money in WallaceMac and Nuvexion through purchase of an equity interest.

260. These false and/or misleading statements were designed to induce and did induce Tucker to purchase an equity interest.

261. Tucker reasonably relied on the statements made by the WallaceMac Defendants, which induced him to purchase the equity interest.

262. Tucker did not know and had no reason to know that the WallaceMac Defendants were operated as a fraud, that Correa was an alias, or that Correa had previous criminal convictions under various names when he purchased the equity interest.

263. Tucker did not know and had no reason to know that the information provided by Correa was false at the time he purchased the equity interest.

264. Tucker would not have purchased the equity interest had he known the information provided by the WallaceMac Defendants was false, that Correa had previous criminal convictions under various names, or that the WallaceMac Defendants were operated as a fraud.

265. The WallaceMac Defendants defrauded Tucker into purchasing a worthless equity interest in a worthless company, and the Correa Defendants used the money invested to fund their lifestyle.

266. As a result, Tucker has been damaged in an amount to be proved at trial.

267. Tucker is entitled to void his purchase of the equity interest and obtain a full refund of all amounts invested in Defendants.

**COUNT XI**

**Securities Fraud**

**(Plaintiffs Against All Defendants)**

268. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth fully herein.

269. Section 10(b) of the Securities Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange Commission ("SEC")] may prescribe." 15 U.S.C. § 78j(b).

270. "Security" is defined broadly to include, among other things, stocks, bonds, debentures, a variety of other instruments, or, "in general, any instrument commonly known as a 'security.'" 15 U.S.C. § 78c(a)(10).

271. The SEC's implementing regulation, Rule 10b-5, further defines the scope of the statutory language and renders it unlawful, in connection with the purchase or sale of any security, to:

a. Employ any device, scheme, or artifice to defraud;
b. Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made not misleading; or
c. Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

*See* 17 C.F.R. § 240.10b-5 (2014).

272. Through the acts and omissions described throughout this Complaint, the WallaceMac Defendants, Nuvex, Quantum X and Correa employed a scheme to defraud investors, made untrue statements of material fact and omitted material facts regarding the WallaceMac Defendants, Correa, and their intellectual property, value of the WallaceMac Defendants, Correa's education, certifications, and experience, and other material facts, and engaged in a course of business which operates as a fraud or deceit upon any person.

273. The WallaceMac Defendants, Nuvex, Quantum X, and Correa engaged in the unlawful conduct described herein in connection with the sale of securities to Plaintiffs.

274. The WallaceMac Defendants, Nuvex, Quantum X, and Correa acted with an intent to deceive, manipulate, and defraud Plaintiffs.

275. Plaintiffs relied on the misstatements and omissions of the WallaceMac Defendants, Nuvex, Quantum X, and Correa and purchased securities based on those misstatements and omissions.

276. As a result of the misstatements and omissions of the WallaceMac Defendants, Nuvex, Quantum X, and Correa, Plaintiffs have suffered significant economic losses in an amount to be proven at trial.

**COUNT XII**

**Violations of Uniform Securities Act, Wy. Stat. §§ 17-4-01 et seq.**

**(All Plaintiffs Against the WallaceMac Defendants, Quantum X, and Correa)**

277. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint as if specifically set forth fully herein.

278. The WUSA prohibits fraud in the sale of securities and states as follows:

> It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly: (i) To employ a device, scheme, or artifice to defraud; (ii) To make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) To engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person.

Wy. Stat. § 17-4-501.

279. The ASA also prohibits fraud in the sale of securities and states as follows:

> It is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities, including securities exempted under section 44-1843 or 44-1843.01 and including transactions exempted under section 44-1844, 44-1845 or 44-1850, directly or indirectly to do any of the following:
>
> a. Employ any device, scheme or artifice to defraud.

b. Make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

c. Engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

A.R.S. § 44-1991(A).

280. The NJUSL contains a similar provision prohibiting fraud in the sale of securities, stating:

> It shall be unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly (a) To employ any device, scheme, or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person; (d) To fail to deliver the prospectus filed under the "Securities Act of 1933" to each purchaser of a security registered under that act, in accordance with the prospectus delivery requirements of that act

N.J.S.A. § 49:3-52

281. The WallaceMac Defendants and Quantum X were incorporated and/or organized in Wyoming.

282. The WallaceMac Defendants prepared and entered into agreements with Plaintiffs for the sale of securities requiring that the agreements be governed by Wyoming law.

283. Correa and Quantum X prepared and entered into agreements with Garcia and Zaner for the sale of securities requiring that the agreements be governed by Wyoming law.

284. The WallaceMac Defendants and Correa offered and sold common stock in WallaceMac to Garcia, Kristen Island, and Kevin Island in the State of Arizona.

285. The WallaceMac Defendants, Nuvex, and Correa offered and sold an equity interest in Nuvex to Tucker in New Jersey.

286. Quantum X and Correa offered and sold common stock in Quantum X to Garcia and Zaner in the State of Arizona.

287. Through the acts and omissions described throughout this Complaint, the WallaceMac Defendants, Nuvex, Quantum X, and Correa engaged in fraudulent conduct in violation of the WUSA, the ASA, and the NJUSL.

288. As a result of the actions of the WallaceMac Defendants, Nuvex, Quantum X, and Correa, Plaintiffs were damaged in an amount to be proven at trial.

289. Plaintiffs are entitled to all relief provided under the WUSA, including, without limitation, the consideration paid for the securities, less the amount of any income received on the securities, and interest at six percent (6%) per year from the date of the purchase, costs, and reasonable attorneys' fees determined by the court, upon the tender of the securities.

290. Alternatively, Garcia, Zaner, Kristen Island, and Kevin Island are entitled to all relief provided under the ASA, including, without limitation, recovery of the consideration paid for the securities, with interest, taxable court costs and reasonable attorney fees, less the amount of any income received by dividend or otherwise from ownership of the securities, on tender of the securities purchased.

291. Alternatively, Tucker is entitled to all relief provided under the NJUSL, including, without limitation, recovery of the consideration paid for the security, together with interest set at the rate established for interest on judgments for the same period by the Rules Governing the Courts of the State of New Jersey from the date of payment of the consideration for the security, and costs, less the amount of any income received on the security, upon the tender of the security.

**COUNT XII**

**Unjust Enrichment**

**(Garcia Against the WallaceMac Defendants and Correa Defendants)**

292. Plaintiffs reallege and incorporate their previous allegations as if set forth fully herein.

293. Defendants directed Plaintiff to open an Amex Card account and used that account for personal and business expenses, including, without limitation, the purchase of computers, phones, and a personal home spa.

294. Defendants were enriched by using the Amex Card account in Garcia's name to purchase items for Defendants' benefit and enjoyment.

295. Garcia was impoverished by the charges incurred by Defendants and their subsequent refusal to pay those charges or return the items purchased, in an amount to be proven at trial.

296. Defendants' actions were improper and unjustified.

297. Garcia has no other remedy at law.

**COUNT XIII**

**Unjust Enrichment**

**(All Plaintiffs Against All Defendants)**

298. Plaintiffs reallege and incorporate their previous allegations as if set forth fully herein.

299. In the alternative, Defendants solicited and received significant sums from Plaintiffs in exchange for common stock and equity interests.

300. Defendants were enriched by receiving Plaintiffs' investments, which were used for Defendants' benefit and enjoyment.

301. Plaintiffs were impoverished by Defendants' taking and misuse of the investments.

302. Defendants' actions were improper and unjustified.

303. Plaintiffs have no other remedy at law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief against Defendants as follows:

A. An Order finding the WallaceMac Defendants, Correa, and Restrepo violated the FLSA, A.R.S. §§ 23-351 and 23-355, and N..J.S.A. § 34:11-4 et seq. by failing to timely pay Garcia, Tucker, and Kristen Island for hours worked;

B. Award Plaintiffs unpaid wages, liquidated damages, treble damages, back pay, front pay, and any other available compensatory damages, as may be determined at trial;

C. Award Garcia and Island a penalty of $150 a day from the date of their retaliatory discharges through the date of judgment.

D. Award Garcia and Island general damages for their emotional distress, sleeplessness, depression, loss of focus and concentration, pain and suffering, inconvenience, mental anguish, embarrassment, frustration, humiliation, and the loss of enjoyment of life, as may be determined at trial;

E. Award Garcia the amount of unpaid charges incurred by and/or on behalf of Defendants on the Amex Card account;

F. Award Plaintiffs punitive damages as may be determined at trial;

G. An Order voiding Plaintiffs' purchases of common stock and equity interest and requiring Defendants to refund all moneys invested by Plaintiffs;

H. Order Defendants to pay reasonable attorney's fees and costs pursuant to A.R.S. § 12-341.01, the FLSA, and other applicable laws;

I. Order Defendants to pay pre-judgment interest on all amounts for which pre-judgment interest is legally allowable, at the highest lawful rate;

J. Order Defendants to pay post-judgment interest at the highest lawful rate for all amounts, including attorney fees, awarded against Defendants; and

K. Order all other relief, whether legal, equitable or injunctive, as may be necessitated to effectuate full relief to Plaintiffs.

Dated this 16th of January, 2026.

RADER MAYROSE LLP

By: s/ Deanna R. Rader______________
Deanna R. Rader
Jamie L. Mayrose

Attorneys for Plaintiffs